IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JODIE L. DETWILER,                      )
    Plaintiff,                      )
         )
  vs.                      )  Civil Action No. 08-1099
         )  Judge Donetta W. Ambrose
CLARK METAL PRODUCTS CO.,               )  Magistrate Judge Robert C. Mitchell
    Defendant.                      )

REPORT AND RECOMMENDATION

I.  <u>Recommendation</u>

It is respectfully recommended that the motion for summary judgment submitted on

behalf of the defendant (Docket No. 19) be denied.

II.  <u>Report</u>

Plaintiff, Jodie L. Detwiler, brings this action against Defendant, Clark Metal Products

Company ("Clark Metal"), asserting claims under the Family and Medical Leave Act of 1993, 29

U.S.C. §§ 2601-54 (FMLA), the Americans With Disabilities Act, 42 U.S.C. §§ 12101-12117

(ADA), and the Pennsylvania Human Relations Act, 43 P.S. §§ 951-63 (PHRA), arising out of

Clark Metal's termination of her employment on July 12, 2007.

Presently before this Court for disposition is a motion for summary judgment, submitted

by the Defendant.  For the reasons that follow, the motion should be denied.

<u>Facts</u>

Plaintiff commenced employment with Clark Metal on March 2, 1998.  (Am. Compl. ¶ 3;

Detwiler Dep. at 18:24-25.)[1]  Plaintiff was Clark Metal's first ever Human Resources manager

and the only Human Resources manager throughout the duration of her employment.  (Detwiler

---

[1]  Def.'s Br. Support. Mot. Summ. J. (Docket No. 20) Exs. A, B.

Dep. at 65:25-66:11.)

As Human Resources manager, Plaintiff's job duties and responsibilities included taking care of employee benefits, hiring, terminations, policy making, and safety training. (Detwiler Dep. at 65:11-20.) Plaintiff indicates that her job responsibilities also included the following: benefit administration/bids, COBRA Administration, wage/salary administration, performance evaluation system, PTO Program, job descriptions, recruitment/job fairs/advertising, hiring/orientation, worker's compensation, progressive discipline forms, employee rewards and dinners, recognition program and gifts, health fairs, health and wellness program, OSHA compliance, certified safety committee training, grants, employee counseling, and personality testing. (HR manager Job Description; Detwiler Aff. ¶ 1.)[2]

Plaintiff was in charge of FMLA compliance for Clark Metal. (Detwiler Dep. at 66:12-22.) She was responsible for maintaining the employee files, including her own. (Detwiler Dep. at 106:4-12.) Plaintiff did not maintain her own file with the same documents, including FMLA-related documents that she required from other employees. (Detwiler Dep. at 131:6-132:25.) She explained that, because she felt the FMLA forms were being returned to her by other employees so that she, the HR manager, could evaluate their need for FMLA leave, it was nonsensical for her to undergo the same process for herself. Instead, she notified Dave Clark Sr., Clark Metal's president, and Rob Clark, Clark Metal's vice president, of her circumstances and formally requested an intermittent FMLA leave by email to them dated September 8, 2006. (Detwiler Dep. at 133:6-192; Docket No. 20 Ex. J.) Rob Clark also testified that it was appropriate for Plaintiff to notify him of her need for intermittent leave. Furthermore, Clark

_____

[2]      Pl.'s App. (Docket No. 26) Exs. 1, 20.

Metal approved her leave. (R. Clark Dep. at 196:16-19.)[3]

Plaintiff was the person responsible for Clark Metal's FMLA administration for all employees of Clark Metal, including herself. (Detwiler Dep. at 66:12-16, 130:12-23, 132:15-133:19.) Plaintiff had knowledge of the FMLA due to her education in the Human Resources field. (Detwiler Dep. at 66:17-22, 130:4-11.) She admits that she was fully informed of her rights and obligations under the FMLA while she was an employee of Clark Metal. (Detwiler Dep. at 130:4-15, 180:11-181:2.)

Throughout Plaintiff's employment with Clark Metal, she reported directly to operations manager and later vice president Rob Clark. (Detwiler Dep. at 22:11-15.) Rob Clark was the sole individual who decided how to rate her performance on her performance appraisals. (R. Clark Dep. at 25.) In or about 2002, Jack Clark[4] retired and Rob Clark assumed most of Jack's responsibilities. (Detwiler Dep. at 85:21-25.) Jack Clark and Rob Clark had different styles of management. (Detwiler Dep. at 81:13-87:2.) Jack Clark had engaged in weekly personal meetings with Plaintiff and frequently attended meetings of outside organizations with Plaintiff. (Detwiler Dep. at 59:5-15, 60:18-61:8.) Plaintiff indicated that Rob Clark is not a micromanager and that he mainly communicated to her through her annual performance reviews. (Detwiler Dep. at 80:12-23, 84:10-11.)

At first, Rob Clark encouraged Plaintiff to participate in outside organizations in connection with her employment, including Indiana County-based committees and boards. (R. Clark Dep. at 17-18.) Later on (within the last three years of her employment), he asked her to

---

[3]     Docket No. 20 Ex. C.

[4]     Jack Clark is Rob Clark's father. (R. Clark Dep. at 11.)

"maybe delegate some of her responsibilities … in those organizations to others in the organization" and "for more time in the office" … "just to make sure that the priorities were right." (R. Clark Dep. at 19-20.)

In response, Plaintiff reminded Rob Clark of the importance of her serving on the boards of these organizations and Rob Clark agreed "there was certain merit in her attending and being active in these organizations." (R. Clark Dep. at 21.)  Rob Clark never told her that he wanted her to stop participating further with these organizations or that there could be consequences, such as losing her job, if she continued such participation.  (R. Clark Dep. at 22.)  After their discussions, Rob Clark and Plaintiff ended with the understanding that she understood where he was "coming from" and that "she would try to prioritize as best she [could]."  (R. Clark Dep. at 22-23.)

Performance Appraisals

As Plaintiff's direct supervisor, Rob Clark conducted each of her annual performance evaluations based on personal observations and feedback from other Clark Metal employees. (Detwiler Dep. at 72:1-3; R. Clark Dep. at 25:13-22, 26:3-12.)  The performance appraisals used for Plaintiff contained a range of 1 to 5, with 3 being "good," 4 being "very good," and 5 being "superior." (Docket No. 26 Ex. 2.)  Rob Clark rated Plaintiff's performance as follows:

|  |  |
|---|---|
| March 1998 – September 1999: | 3.426 |
| October 1999 – March 2000: | 3.55 |
| March 2000 – March 2001: | 3.8 |
| March 2001 – March 2002: | 3.94 |
| March 2002 – March 2003: | 4.03 |
| March 2003 – March 2004: | 4.17 |
| March 2004 – March 2005: | 4.17 |
| March 2005 – March 2006 (dated Nov. 2006): | 3.97 |
| March 2006 – March 2007 (dated April 2007): | 3.5 |

(R. Clark Dep. 26-37; Docket No. 26 Exs. 2-10.)

4

Plaintiff points out that she did not have unexcused absences and was never counseled on absenteeism.  (Detwiler Aff. ¶ 8.)  She performed her job well and sometimes stayed after work to get her work done.  (Detwiler Aff. ¶ 9.)  Plaintiff never asked anyone to lie about her whereabouts.  (Detwiler Aff. ¶ 10.)  Clark Metal did not issue verbal or written reprimands to Plaintiff for tardiness.  (Detwiler Aff. ¶ 11.)  The company's own personnel records show that she had a satisfactory attendance record. (Detwiler Aff. ¶ 12.)  She also notes that Rob Clark gave her an Achievement Recognition Record because she went "above and beyond" and "deserve[d] recognition for" various things.  (R. Clark Dep. at 77; Docket No. 26 Ex. 16.)

Plaintiff notes that Rob Clark indicated that she and the other managers "have a more flexible schedule and they are more free to come and go than [the] hourly production employee." (R. Clark Dep. at 150:8-13.)  There was no limit of personal time off work that Plaintiff was allotted.  (R. Clark Dep. at 90.)  It was appropriate for her to advise Rob Clark when she was taking time off, rather than "requesting" it from him.  (R. Clark Dep. at 96.)

In her 2003 performance review, Rob Clark noted Plaintiff's involvement in outside programs and organizations under accomplishments stating, "she represents [Clark Metal] well and learns a great deal that she can apply to her work here."  (Docket No. 26 Ex. 6.)  In her 2004 performance review, Rob Clark noted that her involvement with the Manufacturing Consortium, SHRM and other organizations "continues to reap benefits" for Clark Metal.  (Docket No. 26 Ex. 5 at 2.)  In Plaintiff's 2005 performance review, Rob Clark noted, as an accomplishment, her hard work in getting the Manufacturing Consortium off the ground.  (Docket No. 20 Ex. I.)

<u>2005 Performance Appraisal</u>

On March 14, 2005, Rob Clark met with Plaintiff to go over her performance appraisal.

Clark Metal points to the following comments:

> • "Jodie displays great leadership skills in her outside organizations, but unfortunately this is affecting her leadership qualities within [Clark Metal]"

> • "... she needs to spend more hours here during the normal work week"

> • "Jodie needs to be more accessible to our employees. Her outside activities have distracted her from her responsibilities here at [Clark Metal]"

> • "I want to help her to refocus her attention on internal matters as opposed to external organizations and activities"

> • "Jodie and I agreed that she needs more 'face time' in the office"

> • "She will work toward delegating some of her outside responsibilities to others in the community and dedicating more time to [Clark Metal]"

(R. Clark Dep. at 57:11-19, 58:6-21, 59:21-60:1; Docket No. 20 Ex. I.)

Plaintiff notes that her 2005 review also contained the following positive comments

regarding her performance:

> • Job knowledge "remains one of Jodie's greatest strengths. She keeps up-to-date on the ever-changing legal issues and she's also very strong with benefits related issues."

> • "Jodie makes good, sound, fair decisions and does so in a timely manner. She works hard to make sure policies are consistently applied by all managers."

> • "…Jodie has done a good job of continuing to remain a positive influence among all [Clark Metal] employees."

> • Problem solving/judgment is "another strong point of Jodie's. She handles problems quickly and more importantly, does a good job of foreseeing potential problems."

> • Regarding dependability, Rob Clark states, "…I know I can count on Jodie to be here whenever I need her. She handles meetings and employee issues at all hours of the night!"

> • "Jodie's initiative is as strong as anyone at [Clark Metal]!"

• "Jodie is a great communicator and keeps us all well aware of important dates, events and policies."

• Regarding safety, "Jodie has improved in this area. She sets a great example for the Safety [Committee] as well as her [management] peers."

• Regarding achieving goals, Rob Clark notes that the "training plan is in development and the employee survey is complete."

• "Jodie continues to handle personnel issues timely and very effectively. Jodie was helpful in the development of our Bonus Plan. She was on the team who evaluated and selected our new Payroll/HR software vendor. Jodie has worked very, very hard in getting the Manufacturing Consortium off the ground and to a sustainable level. And as always, Jodie has worked hard to make sure we have access to all training monies available."

• "Jodie continues to be a very valuable member of our management team."

(Docket No. 20 Ex. I.)  Moreover, she notes that her overall rating on her 2005 performance review was 4.17 out of 5, indicating a performance level between "Very Good" and "Superior." This was the third year in a row that Plaintiff was rated higher than "Very Good" on her annual performance review.  (R. Clark Dep. at 55:22-61:7.)

Plaintiff states that Rob Clark instructed her to reduce her attendance at meetings of outside organizations and devote more time to the employees of Clark Metal during regular working hours.  (Detwiler Dep. at 84:10-11, 80:12-23, 109:11-111:19).  He suggested that she hand over her leadership responsibilities with outside organizations and noted, on page 4 of her 2005 performance review, that she "will work toward delegating some of her outside responsibilities to others in the community…"  However, Rob Clark testified that he did not tell her that he did not want her to participate in the outside organizations.  (Detwiler Dep. at 110:23-111:1; R. Clark Dep. at 22:8-12; Docket No. 20 Ex. I.)

Plaintiff states that she did delegate some of her outside responsibilities to others in the

community, as suggested by Rob Clark.  Specifically, she stepped down as Chair of the Indiana

County Manufacturing Consortium and handed that responsibility over to Mike Remple of Gorell

Windows and Doors.  (Detwiler Aff. ¶ 3.)  She also checked with him before taking on additional

responsibilities.  <u>See</u> Docket No. 20 Ex. N at JLD 0109 (an April 11, 2006 email from Plaintiff to

Rob Clark asking him if she could accept a position as an advisory board member in which she

stated that "I know my participation in organizations was an issue last year and I would not

pursue this without your approval.")

Moreover, on Plaintiff's performance appraisal for the following year (2005-2006), Rob

Clark did not criticize her in any sense regarding her participation in work-related outside

activities.  (Docket No. 26 Ex. 3.)  In fact, he wrote, as an accomplishment, that she had been

especially instrumental in SHRM and the Indiana County Manufacturing Consortium.  (Docket

No. 26 Ex. 3.)  Rob Clark included these comments about the Manufacturing Consortium and

other organization in the Accomplishments section of Plaintiff' review because he thought they

were accomplishments.  (Detwiler Dep. at 110:23-111:1; R. Clark Dep. at 22:8-12, 49:5-11,

65:5-11, 65:18-21.)

<u>Plaintiff's Time Outside the Office</u>

Throughout her years of employment with Clark Metal, Plaintiff participated regularly in

meetings and functions of outside organizations and was out of the office during regular working

hours for the same.  (Detwiler Dep. at 75:13-18, 87:19-88:3, 89:5-12, 90:23-91:6, 91:24-93:9,

96:11-24, 100:22-102:4)  At times, Plaintiff did not return to the office after the conclusion of the

outside organizational meetings.  (Detwiler Dep. at 75:13-23.)  She stated that she frequently

worked from home, as she had a laptop computer, and specifically testified that she would

sometimes work from home after the SHRM meetings.  Furthermore, in his annual review, Rob

Clark noted that he could count on Plaintiff to be there whenever he needed her and that she

handled meetings and employee issues at all hours of the night.  Plaintiff also notes that she

attended only one SHRM meeting in 2006 and two SHRM meetings in 2007.  (Detwiler Dep. at

75:19-23; R. Clark Dep. at 59:21-24; Detwiler Aff. ¶ 4.)

 Nevertheless, Plaintiff's absence from the workplace was noticed by Rob Clark and other

employees of Clark Metal.  (R. Clark Dep. at 18:3-19:24, 20:12-22, 145:3-8, 146:5-147:2,

147:21-148:1; Labuda Dep. at 10:22-12:3, 14:9-23, 18:17-24, 20:2-4, 24:7-19, 29:1-12, 41:6-12;[5]

Rura Dep. at 40:5-41:8;[6] Kemerer Dep. at 22:3-21, 49:5-51:4;[7] D. Clark, Jr. Dep. at 28:11-15;[8] T.

Clark Dep. at 20:9-21:20.[9])  Plaintiff states that she understood that Rob Clark wanted her to

spend less time in her activities with outside organizations and more time during normal business

hours at the office.  (Detwiler Dep. at 84:12-19, 109:11-112:12.)

Plaintiff Requests FMLA Leave

 On September 8, 2006, Plaintiff emailed both Dave Clark, Sr. and Rob Clark regarding

her request for intermittent FMLA leave.  (Detwiler Dep. at 133:13-16; R. Clark Dep. at 192;

Docket No. 20 Ex. J.)  Although this was her first formal request for FMLA leave, Plaintiff states

that she had made it known previously to Clark Metal that her husband and parents suffered their

---

[5]      Docket No. 20 Ex. D.

[6]      Docket No. 20 Ex. E.

[7]      Docket No. 20 Ex. F.

[8]      Docket No. 20 Ex. G.

[9]      Docket No. 20 Ex. H.

own respective serious health conditions for which she needed to provide care and took personal time off ("PTO") from work for these purposes.  (Detwiler Aff. ¶ 5.)

Plaintiff's father was diagnosed with lung cancer in October or November 2006. (Detwiler Dep. at 35:2-5.)  Her father had surgery in January 2007, which his doctors believed wholly removed the cancer; the recurrence of his cancer was not detected until after Plaintiff's termination.  (Detwiler Dep. at 144:7-145:1.)[10]  Plaintiff also states that her mother, who has congestive heart failure, had heart surgery in April 2007.  (Detwiler Dep. at 39:9-13, 145:9-23.)

Plaintiff's husband was diagnosed with amyloidosis in October 2006.  (Detwiler Dep. at 78:3-17.)  However, approximately ten months had elapsed from the time her husband's doctors had expressed concern that something was wrong with him to the time he was formally diagnosed (R. Clark Dep. at 170.)  Rob Clark was aware that amyloidosis is a very serious and fatal disease.  (R. Clark Dep. at 74.)[11]  He was also aware that, as part of his treatment, her husband underwent a stem cell transplant.  (R. Clark Dep. at 76-77.)  This occurred on January 9, 2007.  (Detwiler Dep. at 137; R. Clark Dep. at 91.)

Rob Clark agreed that the times Plaintiff took off work to care for her husband were covered by the FMLA.  (R. Clark Dep. at 103-104.)  He also agreed that some of the absences she took to tend to her father's medical condition would also be covered by the FMLA. (R. Clark Dep. at 105.)  He did not identify any specific instance when she took off work to care for her family members that he believed was not covered by the FMLA.  (R. Clark Dep. at 105-107.)  He

---

[10]    Plaintiff's father died on January 17, 2008, approximately six months after she was terminated.  (Detwiler Dep. at 35.)

[11]    Plaintiff's husband died on February 11, 2008, approximately seven months after she was terminated.  (Detwiler Dep. at 25.)

acknowledged that Plaintiff kept him advised of the medical conditions of her husband and parents.  (R. Clark Dep. at 91-92.)

Plaintiff states that she tried to use her FMLA leave sparingly so that she could fulfill her work responsibilities. (Detwiler Aff. ¶ 6.)  While taking FMLA leave, Plaintiff had her laptop with her when her husband underwent his stem cell transplant and was hospitalized. She worked during this time on the job descriptions and personality testing projects and kept in contact with the office, responding to emails, etc.  (Detwiler Aff. ¶ 7.)

<u>The April 27, 2007 Performance Appraisal</u>

On April 27, 2007, Rob Clark met with Plaintiff to go over her annual performance review.  He  wrote the following on the review:

> Jodie and I had an emotional discussion.  She felt some of the ratings were unfair and expressed that she had been under tremendous emotional stress since late 2006.  She questioned whether I was evaluating the entire year or the period since her last review (since her last review was extremely late).  I told Jodie that her performance had slipped in the <u>past year</u>.  I know she's been dealing with very serious personal problems, but I reminded her that I have to evaluate her job performance.  While I [have] deep empathy for what she has gone through, her job performance has not been up to the standards I expect.  I agreed to grant Jodie one more week of PTO to get her priorities in order.  Upon her return we will complete this eval[uation] and set her goals for the coming year.

(Docket No. 20 Ex. K at 3.)  Plaintiff states that she was emotional because she was talking with Rob Clark about all of the personal matters she had been dealing with for the last year.  (Detwiler Aff. ¶ 15.)

Rob Clark offered and encouraged Plaintiff at her April 2007 review to take an additional week of paid vacation to "get her priorities in order" and "[t]ake the time to re-focus and come back and perform like I KNOW YOU CAN."  Plaintiff used this extra paid time between May 29 and June 4, 2007.  (Detwiler Dep. at 74:20-25; R. Clark Dep. at 68:23-70:8, 110:16-23,

111:14-112:1; Labuda Dep. at 77:4-10; Kemerer Dep. at 34:3-15; Docket No. 20 Exs. K, L.)  She

appreciated being given this additional time off work.  (R. Clark Dep. at 112.)

Rob Clark made the following comments in his notes:

During her review, I offered Jodie one more week off with pay to collect her
thoughts, put things into perspective and come back with new priorities and goals
to work on for the coming year.  She greatly appreciated the offer and said she
would schedule something.  I had hoped she would ... spend the time with her
family or take the time by herself to reflect on things.  Instead she scheduled a
"girls only" week at the beach.  I was personally disappointed to hear that, but it
wasn't my business.  However, prior to leaving for a week's vacation, Jodie made
comments around the office [about] how excited she was to leaving for a week at
the beach.  This did not go over well with most people throughout the office who
questioned how she have another PTO week coming (since she has missed many
weeks with her husband's and parents' health issues) as well as her decision to
vacation without her ill husband.

(Docket No. 20 Ex. N at CMC 0466.)

The May 30, 2007 Meeting

Rob Clark states that, on May 30, 2007, while Plaintiff was away on the week of PTO

that he had given her, he was approached by a majority of the members of the management team

who expressed their dissatisfaction with Plaintiff's participation and performance.  (R. Clark

Dep. at 147:7-20, 160:4-16, 161:7-12, 163:5-164:1, 164:18-165:1, 165:21-23, 167:1-7.)  He

wrote the following in his notes:

June 1: On the morning of Wednesday, May 20, Ron Traister asked if could meet
with me and have a "heart-to-heart" talk about something.  I sensed the urgency
and told him I'd make myself available whenever it was convenient for him.  He
soon contacted me and said that 10:00 was best.

At 10:00 I walked into a meeting with Ron, Jim Rura, Dave Kemerer, Paul
Labuda, Dave Clark Sr. and David Clark, Jr. (Ron and the other non-family
managers called Dave and David for the same reason.)  Ron began the meeting by
saying that he and the others are very upset about Jodie Detwiler's performance.
Ron cited recent examples of how he was treated when he attempted to make
changes to his insurance coverage.  Ron admitted to having past clashes with

12

Jodie, but said that if her action and ignorance were indicative of the way she treats others, Jodie is not upholding our expectations of our management team. She told Ron to get the forms he needed from the lunchroom. Ron did not know which form(s) he needed so her instructions were of no help. Ron eventually went to Tracie Clark to get help in making the changes. *(I am also aware of subsequent errors that Jodie made in processing Ron's changes.)*

Paul Labuda stated that Jodie's mistakes are frequent and that he has asked Tracie to handle some of the responsibilities that Jodie has been handling so that the mistakes would not be so frequent. Paul also expressed his personal frustration with Jodie's frequent absences. He said that her frequent Friday absences were a joke to people throughout the company long before her family's health issues over the past few months.

Dave Kemerer stated that Jodie is a poor reflection of entire management team. He said that, as HR Manager, Jodie is the primary "face" of our management team and that her actions are not well-received by many employees. He said that she's not upholding the standards that the other manages do. He is particularly frustrated by her inattentiveness to our training program. Dave said he has tried to work with her since he arrived (several years ago) to develop a better training program, but she continues to put him off.

Jim Rura also stated that Jodie seems to distance herself from other members of the management team. As we continue to grow, he doesn't feel that she's the right person to serve that role and be a key member of the management team.

Each one of them also expressed disappointment in the fact that she went on a personal vacation with girlfriends this soon after her husband's illness.

I stated that I had lunch the day before with Jack Grube, President of Electro-Mec, to discuss the role of his HR Manager. I told the group that during my discussion with Jack it was becoming clearer that Jodie is not the person we need in that position as we grow. I thanked the group for their candid comments and for their concern for the company. I assured them that one way or another, these issues with Jodie will be addressed.

(Docket No. 20 Ex. N at CMC 0465-66.)

Ron Traister, Sales Manager, testified that the meeting was his idea and that he initiated the meeting because he wanted to discuss some paperwork that he had given Plaintiff that she

had failed to process correctly.  (Traister Dep. at 20:6-21:45.)[12]  Plaintiff states that Traister

complained that his family was not on the dental insurance plan, but that she checked into this

and confirmed that they were.  (Detwiler Dep. at 128-29.)

Paul Labuda, Controller, also testified that Ron Traister initiated the meeting with Rob

Clark.  Labuda complained that Plaintiff's frequent Friday absences were "a joke" to people

throughout the company long before her family's health issues, and that, because of Plaintiff's

frequent mistakes, he had asked Tracie Clark[13] to handle some of Plaintiff's responsibilities.

Labuda further recalls concern about the effect of Plaintiff's outside activities on her work

performance and participation with the rest of the management group.  Rob Clark was also made

aware of Plaintiff's poor performance and failure to participate in management activities such as

her responsibility to update her portion of the company goal spreadsheets.  (R. Clark Dep. at

147:7-20, 163:5-9; Labuda Dep. at 52:2-53:6, 58:21-59:13, 60:19-61:1, 78:14-79:23, 88:5-12;

Docket No. 20 Exs. N, T.)  However,  Labuda also testified that at the meeting he and the other

managers were "miffed" with Rob Clark because he had given Plaintiff an extra week of

vacation.  (Labuda Dep. at 37:14-21; Docket No. 20 Ex. N at CMC 0466.)

Dave Kemerer, quality assurance manager, complained that Plaintiff was a poor reflection

of the management team, was not well-received by the employees, and that he doubted that her

performance would improve from what it had been from 2004 up until the time that she had

taken off to care for her husband.  Moreover, and although he had brought the topic to Rob

---

[12]        Docket No. 26 Ex. 27.

[13]        Tracie Clark is Rob Clark's wife.  (R. Clark Dep. at 11.)  During Plaintiff's tenure as HR
manager, she was an office administrator and later an accountant.  (T. Clark Dep. at 7-8.)

Clark's attention several times dating back to approximately 2004, Dave Kemerer again

expressed his continuing frustration due to Plaintiff's lack of progress in developing a better

training program, despite his requests over several years for her to do so and recurring discussion

of the topic at management meetings.  (R. Clark Dep. at 164:18-165:5; Kemerer Dep. at 7:18-25,

14:9-16, 15:23-20:8, 35:5-36:14; Docket No. 20 Ex. N at CMC 0465-66.)  However, Kemerer

also stated that he "disapproved" of Plaintiff taking an extra week of vacation.  (Kemerer Dep. at

36:15-37:23.)

      According to Rob Clark's notes, Jim Rura, plant manager, told him that Plaintiff

distanced herself from other members of the management team and opined that she was not the

right fit for the management team as the company continued to grow.  (Docket No. 20 Ex. N at

CMC 0466.)  However, Plaintiff points out that, at his deposition, Rura testified that he did not

recall telling Clark that Plaintiff distanced herself from the management team, or thought she did.

(Rura Dep. at 24:21-25:2.)  She further notes that Rura did not state that he told Rob Clark that

Plaintiff was not the right person for the job. (Rura Dep. at 25:3-10.)  On the contrary, Rura

testified that he had a good working relationship with her and that he had no criticisms of her

performance.  (Rura Dep. at 18, 24, 33.)

      Plaintiff Returns from Her Week Off

When Plaintiff returned from her week off, Rob Clark made this entry in his notes:

June 6... Early her first day back, Jodie came into my office and thanked me for
the week off and told me how much fun she had and how rejuvenated she feels.
She jokingly told me there were younger men hitting on her and her girlfriends.
She then told me that her husband spend multiple days in the hospital after nearly
passing out due to his illness.  She was shocked that her husband had instructed
their sons not to contact her.  Frankly, I was appalled that this was the third or
fourth comment she made to me.  She felt the need to tell me about younger men
hitting on her before she told me about her husband's hospital stay.  Once word of

her husband's situation made it around the office, people were again shocked and extremely disappointed that she chose to vacation without him.

(Docket No. 20 Ex. N at CMC 0466.)  At his deposition, Rob Clark confirmed that he was "personally disappointed" that Plaintiff used her time off to take a girls-only trip to the beach. (R. Clark Dep. at 178.)  However, he stated that he did not rely on this opinion or the opinion of others when he fired her.  (R. Clark Dep. at 178-179.)  Although Rob Clark had indicated on April 27 that "[u]pon her return, we will complete this eval[uation] and set goals for the coming year" (Docket No. 20 Ex. K), he never did so.  (Detwiler Aff. ¶ 16.)

The Car-Buying Incident

On June 13, 2007, Plaintiff left work at 11:00 a.m. to co-sign a loan so that her son could purchase a car.  (Docket No. 20 Ex. O.)  She states that she arrived at work at 7:00 a.m. on that day,[14] left work at 11:00 a.m., picked up her son and took him to co-sign for the car, and returned to work two hours later.  Plaintiff stayed late at work that week.  Plaintiff did not have to punch a time clock and was never told she was restricted to a certain amount of time for a lunch break. (Detwiler Aff. ¶¶ 2, 13-14.)

According to Rob Clark, the "car-buying incident" was a factor in the decision to terminate Plaintiff's employment.  (R. Clark Dep. at 120.)  He testified that Plaintiff allegedly left "for a while" one day to purchase her son a car. (R. Clark Dep. at 120.)  However, he did not know for how long  Plaintiff was allegedly gone as he did not personally witness her being absent.  (R. Clark Dep. at 120-121.)  Rather, he heard from others in the office that she supposedly left for this purpose.  (R. Clark Dep. 121.)  Plaintiff had a break for lunch during the

---

[14]     As noted below, Plaintiff's work day technically began at 8:00 a.m.  (R. Clark Dep. at 187:6-12.)

16

work day. (R. Clark Dep. at 123.)   Plaintiff was not restricted to staying at Clark Metal's worksite during her lunch break and was allowed to run errands during that time.  (R. Clark Dep. at 123.)  Rob Clark admitted he did not know how long it would take Plaintiff to buy a car.  (R. Clark Dep. at 121.)

The two individuals who informed Rob Clark of the "car-buying incident" never complained that Plaintiff's alleged absence caused any HR matter to go unattended. (R. Clark Dep. at 125.)  Finally, Rob Clark did not discuss the "car-buying incident" with  Plaintiff until the day he fired her. (R. Clark Dep. at 126.)

<u>The Estate Sale Incident</u>

On June 27, 2007, Plaintiff called in sick from work.  (Docket No. 20 Ex. P.)  She states that she had gotten little sleep the night before because her mother had been discharged from the hospital late in the evening.  She did not get to bed until after midnight.  The next morning she awoke at 5:30 a.m. with a sore throat and she vomited.  She was also suffering from an eye infection for which she took antibiotics.  (Detwiler Dep. at 167-68.)

At first, Plaintiff wrote an email explaining the circumstances but stating that she intended to come into work.  A short while later, she wrote a second time to say that she would not be able to come in.  (Detwiler Dep. at 169; Docket No. 26 Exs. 14, 15.)  Tracie Clark wrote back that there was no problem.  Plaintiff stayed home and spent most of the day in bed, napping. Around 3:00 p.m., Plaintiff's friend called her to ask if she would be coming to the auction at the Novasal Convention Center.  She initially told her friend she was not sure she could make it because she wasn't feeling well.  Although Plaintiff still did not feel well, she forced herself to go to the auction at 5:30 that evening to support her friend who was selling all of her belongings

17

and moving to Florida because her husband had recently committed suicide. (Detwiler Dep. at 164:12-166:9, 167:2-16, 171:10-172:17.)

Rob Clark stated that the "estate sale incident" was a factor in his decision to terminate Plaintiff's employment. He stated that she "had a reputation" for abusing the privilege managers have of maintaining a more flexible schedule. (R. Clark Dep. at 126, 136:22-137:5, 141:15-21, 150:17-22.)

Rob Clark testified that he "heard that Jodie attended a friend's estate sale to buy furniture on one of the days that she was off work" but does not remember who told him the information. (R. Clark Dep. at 137-138.) He did not know the reason why she reported off work the day of the estate sale. (R. Clark Dep. 138.) The entry of attending a friend's estate sale did not appear in Rob Clark's diary until July 12, 2007, the termination date. (Docket No. 20 Ex. N at CMC 0467.)

PTO time is time off during the work day and does not reach into the evening hours. (R. Clark Dep. at 139.) Rob Clark admitted that he was making a serious decision to terminate Plaintiff after a decade of service based on information about which he did not know the details, such as the date it occurred, the time of day or evening it occurred or the reason why she allegedly went to the estate sale. (R. Clark Dep. at 140-142.) He did not ask Plaintiff about the incident because he did not think "it would matter." (R. Clark Dep. at 139-140.) Rob Clark admitted that he did not feel it was important or necessary to find out for a fact the details of the estate sale incident. (R. Clark Dep. at 143.)

Rob Clark's June 29 Entry

On June 29, 2007, Rob Clark made the following entry in his notes:

18

June 29: Jodie's behavior has not changed since her return.  She continues to miss work.  Some absences have been due to Bruce's doctors' appointments; some have been because of meetings.  But it's clear that her work habits have not changed since her review.

(Docket No. 20 Ex. N at CMC 0466.)  However, when asked what he meant by her "work habits," he stated that he could not recall.  (R. Clark Dep. at 181.)  He also could not identify when these meetings occurred and could only recall one meeting that occurred during her last six weeks of employment.  (R. Clark Dep. at 130-31.)

<u>The Events of July 7, 2007 to July 11, 2007</u>

On Saturday, July 7, 2007, Rob Clark received an email message from Plaintiff in which she provided the following report about her husband:

We went to see the Cardiologist yesterday in Pittsburgh.  He has water around his heart and the thickness of his heart is twice as much as it should be.  Normal is .9 and his is 1.7.  This thickness doesn't let his heart relax as it should.  His bloodpressure dropped from 115 down to 70 when he stood up (reason for fainting).  Prognosis is grim... according to the Dr.  We call this Dr. Smith now Dr. Doom and Gloom.  Bruce is handing this amazingly.  I am a basketcase although trying to control my emotions....

We went to the Olive Garden for dinner and we [sat] next to each other in a booth most of the time ... not on the opposite sides.  The waitress probably wondered about us as I had tears in my eyes the whole time.  Then she asked him if he wanted more cheese and he says ... "WHAT are you trying to do KILL ME?"  He and I started to laugh and laugh.  His humor is amazing and as strange as this sounds he will probably be my strength through this.

This is so ... weird for me.  He said he wishes he could figure out a way to get me a lot of money before he goes.  I am encouraging him to stop working and I think that is the direction he is going (wasn't yesterday but is today).  He is going to see how long he has to be there actually working before Erik's tuition stops.

We hope to go the Kidney Dr. and Stem Cell Dr. on Wednesday.  Maybe they can give us more hope than this guy did.  I don't have a clue time wise....  If it is today, tomorrow, next week, next year.... what!  Anyhow that is the story for people if they need to know.

(Docket No. 20 Ex. Q.)

On July 9, 2007, Rob Clark made the following entry in his notes:

July 9: Dave, David and I met to discuss the e-mail we had received from Jodie on 7/7, updating us on Bruce's condition.  In that e-mail, she mentioned that she is encouraging Bruce to quit working (he got a grim prognosis from his cardiologist).  Dave, David and I talked about the timing of terminating her now.  Although we feel awful about firing her (given Bruce's poor condition), we feel that it would be worse to fire her after he potentially quits his job.  After much discussion, we decided that I will fire Jodie this week.  I will contact Mike Supinka and have the severance letter drafted tomorrow (7/10).  Jodie is scheduled to be off on Wednesday (7/11) to attend another appointment with Bruce, so I will dismiss her upon her arrival on Thursday AM (7/12).

(Docket No. 20 Ex. N at CMC 0467.)  Rob Clark affirmed at his deposition that his reasoning for terminating Plaintiff at that time was that it would have been worse for both Plaintiff and her husband to lose their jobs at the same time.  However, he admitted that the reason Plaintiff was encouraging her husband to quit his job was because of his deteriorating condition.  (R. Clark Dep. at 182-186.)  Plaintiff states that she and her husband were told by his cardiologist at the July 7 appointment that he had to quit working and that she believed her husband's last day of work was sometime in August 2007.  (Detwiler Dep. at 27, 125, 174.)  She argues that, based on the information she provided to Rob Clark, it was not realistic of him to believe that her husband would be able to work much longer.

On July 11, Plaintiff sent an email message to Rob Clark stating as follows:

As you know we have been in Pgh all day.  We went to this kidney specialist and the stem cell doctor.  We are going to get a second opinion from another cardiologist, they are going to set up the appointment for us.  We need to know what we are dealing with here.  His other numbers are holding steady.  Not really a lot of change since the transplant although the one dr. said sometimes it takes a full year.  However this heart thing is another story....  this whole disease is very confusing and difficult to comprehend.  I am into it 10 months and I am still trying to get my arms around what each thing means.  Still spilling protein through his urine, still have high light chain numbers (400-500 ... normal is 26) ... but we are

20

"maintaining" and that is the best we can hope for or "some" regeneration ... but he will never be cured ... never.  So we continue on as we are and live life to the fullest.  If the numbers start to go up then we do another Stem Cell Transplant if his heart is strong enough to deal with it.

(Docket No. 26 Ex. 12.)

Plaintiff Is Fired

Plaintiff's employment was terminated when she arrived at work on July 12, 2007.  (Am. Comp. ¶ 16; Detwiler Dep. at 112:13-17; R. Clark Dep. at 182:2-15.)  Plaintiff notes that on the day she was terminated, she arrived at work 6:50 a.m., even though her day technically began at 8:00 a.m.  (R. Clark Dep. at 187:6-12; Docket No. 20 Ex. 13.)

Rob Clark made this final entry in his notes:

July 12: Jim Rura and I met Jodie in her office as she was just arriving for the morning (approximately 6:50 AM).  I presented her with a severance agreement and informed her that we were letting her go.  I said that she has continued to have attendance problems (even outside of her time off with Bruce) and when she is here, her priorities are questioned by many people.  I also said that her quality of work is becoming a problem.  I told her that a group of managers met with me to express their displeasure with her for the reasons I just mentioned.  And I feel that she's burned bridges with many others.  She was clearly shocked and admitted that she has been distracted by her personal life for the past year.  I told her that this has been coming on for much longer than a year.  I said that I have remained her longest and last ally, but that I have lost faith in her also.  I said that she has become an island; isolating herself from everyone in the company.  And as HR Manager, we cannot tolerate that.  She blamed me for not being more attentive to her and said that I have not even given her her goals for the year (to complete her review).  I said that I haven't see her behavior changing since she returned (from her vacation in May) and that I haven't felt it was worth my time to establish goals for her.  I cited two very recent examples which indicate that her attendance behavior is not changing: I know she left for several hours one day to buy her son a car and I said I have reason to suspect she took a day off to attend a friend's auction at her home.  Jodie said she wanted to gather her personnel file and her personal belongings, but I told her that I wanted her to leave the building immediately.  I told her that her personal items would be gathered and shipped to her home address.  I told her that I wanted to keep her laptop and that we would reimburse her for the money that she has paid thus far.  She said she wanted the entire contents of the hard drive.  I told her that we would copy her personal files,

pictures, etc. to a DVD and send it to her as well.  I left her office at
approximately 7:00 AM and Jim stayed with her and escorted her to her car
moments later.

(Docket No. 20 Ex. N at CMC 0467.)  See R. Clark Dep. at 187-89 (stating that his

contemporaneous notes accurately reflect what occurred).

 Plaintiff testified that Rob Clark told her that he "had to let [her] go," she asked him,

"why?"  Rob Clark said to Plaintiff that she knew why and she told him that she did not.  He said

that employees were complaining about her absenteeism and she reminded him that she was "on

FMLA."  He said he understood but there were two days that she took that were not related to

FMLA leave.  Plaintiff did not know to what Rob Clark was referring and asked him to explain.

Rob Clark referenced "the car thing" and a day when she called off sick and attended an auction.

He also said that she had become "an island" and that she made mistakes at work.  (Detwiler

Dep. 114:4-115:9.)

 <u>Procedural History</u>

 Plaintiff filed a charge with the Equal Employment Opportunity Commission on or about

December 17, 2007 and received a Right to Sue letter dated May 9, 2008.  (Am. Compl. ¶ 2.)

She filed this action on August 6, 2008 and on October 10, 2008, she filed an amended complaint

(Docket No. 4).  In Count I, she alleges that Defendant interfered with her rights under the FMLA

by terminating her employment and by failing to inform her of her rights under the FMLA.  In

Count II, she alleges that Defendant violated the FMLA's anti-retaliation provision by firing her.

In Count III, she alleges that Defendant terminated her because her husband was disabled and her

parents had serious health conditions, in violation of the ADA's associational discrimination

provision.  In Count IV, she alleges that Defendant's act of firing her because of her husband's

22

disability also violated the PHRA and that it engaged in acts of failure to accommodate.

On October 30, 2009, Defendant filed a motion for summary judgment.

Standard of Review

Summary judgment is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Woodside v. School Dist. of Philadelphia Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001) (quoting Foehl v. United States, 238 F.3d 474, 477 (3d Cir. 2001) (citations omitted)). In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. Doe v. County of Centre, PA, 242 F.3d 437, 446 (3d Cir. 2001); Woodside, 248 F.3d at 130; Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999).

While the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing'–that is, pointing out to the District Court–that there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Defendant argues that: 1) Count I must be dismissed because Plaintiff's claim under the FMLA is for retaliation, not interference, and she cannot contend that she was not informed of her rights under the FMLA when she was the HR director at the company; 2) Count II fails

because Clark Metal had a legitimate, nondiscriminatory reason for firing her and she has not demonstrated that this proffered reason was a pretext for unlawful retaliation discrimination under the FMLA; 3) Count III fails because the same analysis leads to the conclusion that she cannot demonstrate the Clark Metal's reason for firing her was a pretext for unlawful associational disability discrimination under the ADA; and 4) Count IV fails because she cannot demonstrate a failure to accommodate in violation of the PHRA and because her retaliation claim is subject to the same analysis as the FMLA and ADA claims.

In response to Defendant's motion, Plaintiff has conceded that she was informed of her rights under the FMLA (Pl.'s Resp. Def.'s Concise Statement Material Facts ¶ 51)[15] and she clarifies that she is not raising a claim that Defendant failed to accommodate her under the ADA or PHRA (Pl.'s Br. at 15 n.5, 16 n.6).[16]   However, she argues that: 1) Clark Metal interfered with her FMLA rights by terminating her employment; 2) she can demonstrate FMLA retaliation based on unusually suggestive timing, ongoing animus, evidence of inconsistencies and the act of hiding the decision maker; 3) her ADA and PHRA associational discrimination claim is that Clark Metal fired her because of potential high health care costs she would incur for her ill husband, as well as a claim that she was "distracted" but still able to perform her job and that Clark Metal fired her because of her association with her disabled spouse, and she has evidence of pretext to support these claims.   Defendant replies that these claims are unsupported in the record.

Counts I-II: FMLA Claims

---

[15]      Docket No. 24.

[16]      Docket No. 23.

The FMLA was enacted in 1993 for two purposes: to "balance the demands of the workplace with the needs of families" and to "entitle employees to take reasonable leave for medical reasons."  29 U.S.C. § 2601(b)(1-2).  The Act grants to an "eligible employee," among other things, the right to twelve workweeks of leave, over any period of twelve months, "[i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition."  29 U.S.C. § 2612(a)(1)(C).  The leave may be taken intermittently or by reduced schedule when medically necessary.  29 U.S.C. § 2612(b)(1).

The FMLA further provides that:

> any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave–
>
> > (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or
> >
> > (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

29 U.S.C. § 2614(a)(1).  However, once the twelve-week period ends, an employee who remains "unable to perform an essential function of the position because of a physical or mental condition ... has no right to restoration to another position under the FMLA."  29 C.F.R. § 825.214(b).  See Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 384 (3d Cir. 2002).

The Act contains two relatively distinct types of provisions: a series of prescriptive substantive rights for eligible employees, often referred to as the "entitlement" or "interference" provisions which set floors for employer conduct, 29 U.S.C. §§ 2612, 2614(a)(1); and protection against discrimination based on the exercise of these rights, often referred to as the "discrimination" or "retaliation" provisions, 29 U.S.C. § 2615(a)(1-2); 29 C.F.R. § 825.220(c).

Callison v. City of Phila., 430 F.3d 117, 119 (3d Cir. 2005).  An employee may bring suit to enforce these rights pursuant to section 2617(a) of the Act.  Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 141 (3d Cir. 2004).  Plaintiff asserts claims under both the interference and the retaliation provisions.  However, Defendant contends that her claims sound only under the retaliation provision.

The Court of Appeals for the Third Circuit has held that, "[i]n order to assert a claim of deprivation of entitlements, the employee only needs to show that he was entitled to benefits under the FMLA and that he was denied them."  Callison, 430 F.3d at 119.  The court has further explained that:

> Under this theory, the employee need not show that he was treated differently than others.  Further, the employer cannot justify its actions by establishing a legitimate business purpose for its decision.  An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA.

Id. at 119-20.  In contrast, an FMLA retaliation claim is subject to the burden-shifting framework applied to other discrimination claims (under Title VII, the ADEA and the ADA), as set forth in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973).  Conoshenti, 364 F.3d at 146-47.

Count I: Interference Claim

Defendant argues that Plaintiff cannot contend that Clark Metal interfered with her FMLA leave when the "interference" took the form of a termination, which serves as the basis for her retaliation claim.  Plaintiff responds that, regardless of the fact that Clark Metal granted her prior request for FMLA leave, it still interfered with her rights by terminating her.

In Conoshenti v. Public Service Electric & Gas Co., 364 F.3d 135 (3d Cir. 2004), a mechanic who was under a Last Chance Agreement (LCA) called his employer (PSE & G) on

December 6, 1999 to say that he had been in an auto accident and would need to be off work for two weeks to recover.  He then met with an orthopedic surgeon, who diagnosed him with torn rotator cuffs and recommended immediate surgery.  On December 17, 1999, Conoshenti sent PSE & G a form indicating his diagnosis and that he would be unable to work until approximately April 2000.  But on December 20, 1999, PSE & G began steps to terminate Conoshenti's employment for having violated the LCA.  The letter of termination was not sent after Conoshenti sent a letter to his supervisor specifically requesting leave under the FMLA and PSE & G concluded that it could not terminate him in this situation.

On March 28, 2000, Conoshenti's doctor approved his return to work for "desk duty" as of April 3, 2000.  He informed PSE & G, but was told that the facility where he worked could not accommodate desk duty and that his return to work would have to be delayed until his doctor cleared him for full manual labor.  Shortly thereafter, his doctor approved his return to full duty and Conoshenti reported for work on April 17, 2000.  However, on April 12, 2000, PSE & G had reinitiated administrative steps to end his employment for violating the LCA and when Conoshenti reported for work, he was fired.

The Court of Appeals observed that courts of appeals had taken divergent paths in analyzing claims that an employee has been discharged in retaliation for having taken FMLA leave, with some circuits finding that such claims would arise under § 2615(a)(2) and others holding that §§ 2615(a)(1), 2615(a)(2) and 29 C.F.R. § 825.220(c) all give rise to retaliation claims.  The Court of Appeals concluded that it was appropriate to "predicate[] liability in such situations on § 825.220(c)," instead of §§ 2615(a)(1) or 2615(a)(2).  Id. at 147 n.9.

More recently, the Court of Appeals addressed several FMLA issues in a case in which

the employee alleged that she was terminated after requesting leave but before she could use it

and the employer tried to argue that she could not avail herself of the retaliation provision

because she had not yet taken the leave.  Erdman v. Nationwide Ins. Co., 582 F.3d 500 (3d Cir.

2009).  The court noted that "it is not clear whether firing an employee for requesting FMLA

leave should be classified as interference with the employee's FMLA rights, retaliation against

the employee for exercising those rights, or both."  Id. at 509 n.4.  The court held that it would:

> interpret the requirement that an employee "take" FMLA leave to connote
> invocation of FMLA rights, not actual commencement of leave. We therefore hold
> that firing an employee for a valid request for FMLA leave may constitute
> interference with the employee's FMLA rights as well as retaliation against the
> employee.

Id. at 509 (footnote omitted).

Defendant notes that the only adverse employment action alleged by Plaintiff was her

termination from employment by Clark Metal. (Am. Comp. ¶ 16, Detwiler Dep. at 112:13-17, R.

Clark Dep. at 182:2-15.)  It further observes that Plaintiff never recalls an instance when Clark

Metal ever denied any of her requests for time off, FMLA-qualifying or otherwise, while an

employee of Clark Metal.  (Detwiler Dep. at 22:8-21, 23:10-24:4.)

Defendant further contends that, prior to her termination, Plaintiff did not indicate to

anyone at Clark Metal that she would need to take future time off for FMLA purposes.  (Detwiler

Dep. at 176:11-22.)  However, Plaintiff points to the following evidence in the record: she

informed Clark Metal via email dated July 7, 2007, that her husband's prognosis was "grim"; she

informed Clark Metal via email dated July 10, 2007 that she would be "in Pittsburgh" all day

accompanying her husband to a medical appointment (R. Clark Dep. at 158; Docket No. 20 Ex.

Q); and she informed Clark Metal via email dated July 11, 2007 that she and her husband would

need to obtain a second opinion from another doctor, that the current cardiologist would be setting up the appointment for the second opinion, that it could take a year for her husband to recuperate from his January 2007 stem cell transplant, that her husband was still passing protein in his urine and had "high light chain numbers" of 400-500 where 26 is normal, that the best she could hope for was "regeneration" but not a cure and that there was the possibility of his having to undergo another stem cell transplant if "the numbers start to go up." (Docket No. 26 Ex. 12.) She further testified as follows:

> Q. Did you indicate to anybody at the company that you would need to take future time off for FMLA purposes?
>
> A. Specifically, no, but I believe, that due to the situation of the health conditions of my family, that it was known that that was going to be need.
>
> Q. And why do you say that?
>
> A. Because my husband was sick and he wasn't getting better.  I mean this was just not going to end.
>
> Q. And did you, as your husband's condition was being discovered and being treated, did you advise the company accordingly?
>
> A. I advised them all along what was going on with everybody.

(Detwiler Dep. at 176:19-177:6.)  In addition, Rob Clark indicated that he did not know whether Plaintiff had used all 12 weeks of her statutorily-entitled FMLA leave when he fired her.  (R. Clark Dep. at 199.)  Plaintiff testified that she had not yet exhausted her FMLA leave.  (Detwiler Dep. at 180.)

Viewing all inferences in favor of Plaintiff as the non-moving party, she has stated a claim for interference with her rights under the FMLA.  Specifically, she has pointed to evidence that Clark Metal had already granted her FMLA leave that she had not yet exhausted, that she

informed the company of her husband's deteriorating condition which would have required her to take additional FMLA leave and that, within days of being so notified, Clark Metal terminated her employment.  As observed by the Court of Appeals in Erdman, this factual scenario states a claim for retaliation, but also fits within the rubric of an FMLA interference claim.  Therefore, with respect to Count I, the motion for summary judgment should be denied.

Count II: Retaliation Claim

In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of discrimination indirectly following the shifting burden analysis set forth by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973) and refined in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 278-79 (3d Cir. 2000).

As the Court of Appeals has stated:

> The existence of a prima facie case of employment discrimination is a question of law that must be decided by the Court.  It requires a showing that: (1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action...

Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003) (footnote and citations omitted).

If the employee presents a prima facie case of discrimination, the employer must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." McDonnell Douglas, 411 U.S. at 802.  If the employer specifies a reason for its action, the employee must have an opportunity to prove the employer's reason for the adverse employment action was a pretext for unlawful discrimination.  Id. at 804.  The Court of Appeals has stated that:

30

[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered  legitimate  reasons must allow a factfinder to reasonably infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action  (that is, the proffered reason is a pretext).

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).  This framework applies to discrimination cases brought under the FMLA's retaliation provision.  Conoshenti, 364 F.3d at 146-47.

To state a prima facie case of FMLA retaliation, a plaintiff "show that (1) he took an FMLA leave, (2) he suffered an adverse employment decision, and (3) the adverse decision was causally related to his leave."  Conoshenti, 364 F.3d at 146 (footnote omitted).  Defendant argues that Plaintiff cannot establish a causal nexus between her FMLA leave and her termination. Plaintiff points to the unusually suggestive timing, ongoing animus, evidence of inconsistencies and the act of hiding the decision maker.

As noted above, Plaintiff began taking intermittent FMLA leave in September 2006 and was still taking it on the date she was terminated.  In addition, she notified Clark Metal on July 7, 2007 that her husband's prognosis was "grim" and that she was encouraging him to quit his job. Thus, there is at least an issue of fact as to whether Clark Metal was put on notice that Plaintiff would be seeking additional FMLA leave and would be presenting claims for her husband's health care expenses to Clark Metal once he was no longer working at his job.  On July 12, 2007, five days later, she was terminated.  Under these circumstances, Plaintiff has supported her contention that unusually suggestive timing connects her information regarding FMLA leave and the company's adverse employment decision.

Defendant argues that more than ten months elapsed from the date Plaintiff requested

31

FMLA leave (September 8, 2006) to the date she was terminated (July 12, 2007).  However, it provides no support for the proposition that timing should be measured this way.  Had Plaintiff taken off twelve continuous weeks of leave and then been fired within days of her return, she could easily demonstrate unduly suggestive timing between the act of her taking leave and the adverse employment action.  Parker v. Hanhemann Univ. Hosp., 234 F. Supp. 2d 478, 492 (D.N.J. 2002).  In this case, Plaintiff was taking intermittent leave which she may not have exhausted at the time she was terminated and she had provided information that she might need to take additional leave.  Thus, she has connected the protected activity to the adverse employment action.

In addition, Plaintiff has pointed to inconsistencies in Defendant's position.  On the one hand, Rob Clark testified that he "knew that she had to be terminated or should be terminated the day the ... members of the management team met with me," that is, May 30, 2007.  (R. Clark Dep. at 160:6-8.)  Nevertheless, he took no action for nearly six weeks thereafter until he received Plaintiff's email on July 7, 2007 which informed him that her husband's condition was deteriorating and that she was encouraging him to quit his job.  Defendant has not provided any explanation of why the company did not terminate her employment when she returned from her week of PTO or for six weeks after that time.

On the other hand, when Plaintiff asked why he was terminating her, Rob Clark pointed to the car-buying incident and the estate sale incident as though they were the "final straws."  Nevertheless, as explained above, the circumstances surrounding these incidents are vigorously disputed, Rob Clark never approached Plaintiff to obtain her side of the story, and the record supports an inference (which must be drawn in Plaintiff's favor as the non-moving party) that it

was her FMLA leave that precipitated her termination.  The record also supports an inference that Rob Clark was "lying in wait" for her to commit a minor infraction that he could use to terminate her employment, even though he had never told her that she was "on probation" or a "last chance agreement."[17]  It is further noted that Rob Clark referred to the car-buying incident as a "non-FMLA <u>day</u>" even though the evidence demonstrates that Plaintiff took off only two hours at lunchtime, that she came into work early that day and that she worked late that week.

Moreover, Defendant now contends (although Rob Clark did not say anything about it when he terminated her) that Plaintiff's attendance at outside meetings was a factor. (R. Clark Dep. at 23:22-24:2.)  Defendant states that, after her April 2007 review, Plaintiff continued to attend outside organizational meetings such as those for the Indiana County Manufacturing Consortium.  (Docket No. 20 Ex. M.)  According to this exhibit, the meeting occurred on May 18, 2007.  Thus, despite the reference to "meetings," Defendant's evidence demonstrates only that she attended one outside meeting.

Plaintiff confirms in her affidavit that, in her last six weeks of employment, she attended only one SHRM meeting and that, since 2005, she returned to her office after any outside meeting occurred.  (Detwiler Aff.  ¶¶ 4, 13.)  Defendant has provided no evidence to the contrary.  Moreover, she notes that Rob Clark never told her not to attend any meetings.  In fact, Rob Clark testified that he did not tell her that he wanted her to completely stop her participation in the

---

[17]     Last chance agreements "provide for the conditional reinstatement of an employee who faces discharge or serious disciplinary action for violating a work rule.  In these agreements, an employer agrees to withdraw the threat of discipline in return for the employee's promise to refrain from further infractions and to waive certain procedural rules regarding the grievance and arbitration process in the event that the employee commits another infraction."  <u>United Steelworkers of America, AFL-CIO-CLC v. Lukens Steel Co.</u>, 969 F.2d 1468, 1470 (3d Cir. 1992).

outside organizations or that her job would be in jeopardy if she did not stop participating in them.  (R. Clark Dep. at 22-23.)

For all of these reasons, Plaintiff has stated a prima facie case of FMLA retaliation discrimination.  The burden thus shifts to Defendant to articulate a legitimate, non-discriminatory reason for her termination.  It has done so by pointing to evidence that Plaintiff was not meeting Clark Metal's expectations for her performance, that she was excessively absent from the office (not including her FMLA-absences) and that she had distanced her self from other employees at the company.   Rob Clark, the decision maker regarding Plaintiff's termination, stated that Plaintiff's FMLA-qualifying absences to care for her ill family members were not a factor in his decision to terminate Plaintiff's employment.  (Detwiler Dep. at 114:12-115:9; R. Clark Dep. at 126:5-128:4, 154:2-9, 187:13-19.)  Rather, Rob Clark stated that Plaintiff's termination was the result of poor work performance and effort that manifested itself in Plaintiff's non-FMLA-related absences and Plaintiff's failure to fully participate in her job.  (Detwiler Dep. at 114:12-115:9, R. Clark Dep. at 126:23-127:6; Rura Dep. at 19:11-13.)

Plaintiff must point to evidence from which the trier of fact could conclude that Defendant's proffered reason is a pretext for unlawful retaliation discrimination.  She proceeds along "Fuentes prong one" by arguing that she has submitted evidence from which a factfinder could reasonably disbelieve the employer's articulated legitimate reason.  Keller v. ORIX Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc).  She also proceeds along "Fuentes prong two" by arguing that Defendant's own evidence "allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  Keller, 130 F.3d at 1111.

<u>Fuentes Prong One Evidence</u>

Plaintiff's <u>Fuentes</u> prong one evidence challenges Defendant's reliance on her attendance at outside meetings, failure to return to the office after the meetings, the car-buying incident and the estate sale incident.  Plaintiff contends that, in each instance, Defendant did not inform her of the alleged problem and has construed these incidents in a manner that does not reflect what actually occurred.

Rob Clark stated that Plaintiff's non-FMLA-related absences, such as those for organizational meetings, were a factor related to her termination.  (R. Clark Dep. at 23:22-24:2.) But Plaintiff notes that on July 12, 2007, when Rob Clark notified her of her termination, he did not tell her that her attendance at organizational meetings was a reason or factor in the decision to terminate her.  Moreover, Rob Clark testified that he did not tell her that he wanted her to completely stop her participation in the outside organizations or that her job would be in jeopardy if she did not stop participating in them.  (R. Clark Dep. at 22-23.)  Finally, Plaintiff notes that Carrie Roup, her replacement as HR manager, attends meetings of at least one outside organization, the Indiana County Manufacturing Consortium.  (Detwiler Dep. at 114:14-115:9; Docket No. 20 Ex. N at CMC 0467; R. Clark Dep. at 82-83; Roup Dep. at 26:13-16.[18])

Rob Clark testified that since her return from the extra week off, Plaintiff took time off before or after the outside meetings she attended and that it was not appropriate for her to attend the outside meetings or avoid coming to work before or after them.  (R. Clark Dep. at 128-129.) But he could not recall ever telling this to Plaintiff.  (R. Clark Dep. at 129.)  Nor could he identify the meetings to which he was referring. (R. Clark Dep. at 129.)  Nor could he give an

---

[18]     Docket No. 26 Ex. 25.

estimate of the number of meetings Plaintiff supposedly attended after she returned to work from the extra week off.  (R. Clark Dep. at 130.)

There was no specific time Rob Clark could recall that Plaintiff took off work either before or after allegedly attending an outside meeting during the last six weeks of her employment.  (R. Clark Dep. at 132-133.)  Plaintiff stated that, to the contrary, since 2005, she always returned to the office after she attended meetings for outside organizations. (Detwiler Aff. ¶ 4.)  Defendant has pointed to no evidence to the contrary.

Although Rob Clark testified that the allegation that Plaintiff took off time from work was based in fact "at times," he could not provide a single example of when it actually happened. (R. Clark Dep. at 148.)   He never told her that he believed she inappropriately took time off from work before or after attending outside meetings until the day he fired her.  (R. Clark Dep. at 149.)  Moreover, he stated that she "unfairly got [the] reputation" for always taking time off work.  (R. Clark Dep. at 148.)  He stated that he used the opinions of others that Plaintiff had a reputation for taking time off as a reason to terminate her. (R. Clark Dep. at 146-147.)  He admitted that he did not recall whether he spoke about Plaintiff's alleged reputation with her, when he may have done so, or how many times he may have done so.  (R. Clark Dep. at 148.)

Rob Clark told Plaintiff that he had reason to believe that she left for a couple hours one day to buy her son a car. (R. Clark Dep. at 125-126.)  But he never asked her how long she was gone from work that day. (R. Clark Dep. at 126.)  Moreover, Rob Clark testified that he did not personally witness Plaintiff being absent during the "car-buying incident," did not know for how long she was out of the office and merely heard from others that she supposedly left the office to buy a car. (R. Clark Dep. at 120-121.)  He further testified that the two individuals who informed

36

him of the "car-buying incident" never complained that her alleged absence caused any HR

matter to be left unattended.  (R. Clark Dep. at 125.)  He did not discuss this incident with

Plaintiff until the day he fired her.  (R. Clark Dep. at 126.)

As noted above, Plaintiff testified that she left work for two hours (11:00 am-1:00 pm) to

pick up a car that she and her son had previously purchased. (Detwiler Dep. at 164-165.)  She

arrived at work that day at 7:00 am and worked late all that week.  (Detwiler Dep. at 165.)  At no

time did Clark Metal ever tell Plaintiff that she was restricted to a certain amount of minutes for

her daily lunch break.  (Detwiler Dep. at 165.)  Plaintiff was a salaried employee and did not

punch a time clock.  (Detwiler Dep. at 166.)

Rob Clark testified that he used Plaintiff's "car-buying incident" as a reason to fire her

because she had "a reputation for abusing" the privilege managers had enjoyed by having a more

flexible schedule. (R. Clark Dep. at 150.)  But he also admitted she unfairly got such a

reputation.  (R. Clark Dep. at 148.)  Moreover, Rob Clark referred to the car-buying incident as a

"non-FMLA day" even though the evidence demonstrates that Plaintiff took off only two hours at

lunchtime, that she came into work early that day and that she worked late that week.

Regarding the estate sale incident, Rob Clark admitted that he did not find out the reason

Plaintiff took off work the rest of the day on June 27, 2007 when he was deciding to terminate

her and did not know if this absence would be covered by the FMLA. (R. Clark Dep. at 155.)

Tracie Clark had responded to Plaintiff's email by saying that there was no problem with her

taking off the day because she was sick.  (R. Clark Dep. at 155.)

Rob Clark testified that he "heard that Jodie attended a friend's estate sale to buy

furniture on one of the days that she was off work" but does not remember who told him the

37

information.  (R. Clark Dep. at 137.)  The entry of attending a friend's estate sale did not appear

in Rob Clark's notes until July 12, 2007, the termination date.  (Docket No. 20 Ex. N at CMC

0466.)  Nor did Rob Clark know when he was allegedly told the information.  (R. Clark Dep. at

138.)  He did not know the reason why Plaintiff reported off work the day of the estate sale.  (R

Clark Dep. at 138.)  He stated that PTO time from work is time off during the work day and does

not reach into the evening hours.  (R. Clark Dep. at 139.)

Rob Clark failed to ask Plaintiff about the incident because he did not think "it would

matter." (R. Clark Dep. at 139-140.)  He admitted that he was making a serious decision to

terminate Plaintiff after a decade of service based on information about which he did not know

the details, such as the date it occurred, the time of day or evening it occurred or the reason why

she allegedly went to the estate sale.  (R. Clark Dep. at 140-142.)  He also admitted that he did

not feel it was important or necessary to find out for a fact the details of the estate sale incident.

(R. Clark Dep. at 143.)

As noted above, Plaintiff testified that on June 26, 2007, she brought her mother home

from the hospital and got into bed after midnight.  (Detwiler Dep. at 167-168.)  On her way

home, Plaintiff began to have a sore throat and when she woke up at 5:30 a.m. on June 27, she

did not feel well but had planned to report to work.  (Detwiler Dep. at 168.)  She also had an eye

infection for which she used antibiotics.  (Detwiler Dep. at 168.)  Plaintiff also vomited when she

woke up.  (Detwiler Dep. at 169.)  She emailed Clark Metal that her mother had been in the

hospital and discharged the previous night and that she was not feeling well and would not be

able to come to work.  In the email, she noted that had been sleeping only five hours a night.

(Detwiler Dep. at 169; R. Clark Dep. at 156-57; Docket No. 26 Ex. 15.)  No one informed her

that her absence from work caused any problems.  (Detwiler Dep. at 171.)

In the afternoon, Plaintiff's friend called her to ask her if she could attend her auction as she was moving.  (Detwiler Dep. 171.)  Plaintiff did not commit to attending and, even though she did not feel well, she forced herself to go to the auction around 5:30 p.m., after her normal working hours with Clark Metal. (Detwiler Dep. at 171-172.)[19]

Rob Clark admitted that if Plaintiff's absence on June 27, 2007 in connection with caring for her mother and for herself, as described in her emails from that day, were covered by the FMLA, she would be protected from termination because of that absence. (R. Clark Dep. at 153; Docket No. 26 Exs. 14, 15.)  But rather than investigate the matter or even ask Plaintiff for her side of the story, he appears to have assumed the worst-case scenario: that she lied about being sick in order to take off during working hours to attend a sale with her friend.  Nevertheless, he did not terminate her employment when the estate sale incident occurred, and he has not stated that he fired her on July 12, 2007 because he just learned of it.  Rather, as described above, he terminated her employment shortly after receiving her July 7 email notifying him of her husband's deteriorating condition and the fact that she was encouraging him to quit his job.

Plaintiff's Fuentes prong two evidence

Plaintiff's Fuentes prong two evidence consists of comments made by Rob Clark and others regarding her FMLA leave and her week of PTO and the manner in which her termination appears connected to her July 7 email regarding her husband's condition and the fact that she was encouraging him to quit his job.

---

[19]    Defendant describes the time of the estate sale as an "allegation" on Plaintiff's part.  But Plaintiff has testified under oath that she went at 5:30 p.m., Defendant has provided no evidence to the contrary and this fact must be construed in Plaintiff's favor as the non-moving party.

Plaintiff notes that, less than three months before her termination, Rob Clark rated her between a "good" and "very good" performer.  (R. Clark Dep. at 143-144.)  He suggested that she take off a week of PTO and wrote on her appraisal that, when she returned, they would complete her evaluation and set her goals for the year.  He did not identify anything that she did between April 27, 2007 and May 29, 2007 that made him decide to terminate her employment.

Rather, while she was away and unbeknownst to her, a meeting was held at which she was criticized for, inter alia, taking a week of vacation.  Rob Clark and others also "disapproved" of the fact that she took this vacation with her girlfriends instead of spending it with her ill husband.  Rob Clark also stated that the fact that others "lost respect" for her was a factor in his decision to fire her.  (R. Clark Dep. at 163-164.)  The managers in the May 30, 2007 meeting were aware of the medical conditions of Plaintiff's spouse and parents. (R. Clark Dep. at 165.)

Rob Clark criticized Plaintiff for being "an island."  However, he admitted he could understand why others may have felt that she was distant, given the serious medical conditions of her spouse and parents.  (R. Clark Dep. at 166; Detwiler Dep. at 115.)

When she returned from her week off, Rob Clark did not meet with her to review her goals for the year as he had promised to do at the review.  Nor did he tell her about the May 30 meeting or warn her that if she attended an outside meeting she would be terminated.  Instead, his notes after her return focus on her decision to tell him (jokingly) that younger men were hitting on her at the beach before relating that her husband had collapsed while she was away.

Plaintiff went back to work and kept Rob Clark informed about her husband's condition, including emailing him on July 7 that her husband's condition had deteriorated and that she would be encouraging him to quit his job.  The next thing she knew she was terminated on July

40

12, 2007.  When she asked why, Rob Clark referred to the car-buying incident and the estate sale incident, even though he had never mentioned them before, and he did not ask her for her side of the story.

Rob Clark indicated that, at the time he made the decision to fire Plaintiff, he did not look at her absenteeism and determine which absences were protected by the FMLA and which ones were not. (R. Clark Dep. at 154.)  He stated that he did not need to look at which absences qualified under the FMLA because he "felt that [he] was aware of enough instances that had nothing to do with [her] family's health issues." (R. Clark Dep. at 154.)

Rob Clark testified that the concerns about Plaintiff from Ron Traister, Sales Manager, was a factor in his decision to fire her.  (R. Clark Dep. at 161-163.).  But he never discussed the matter with Plaintiff because he did not "think it would have made a difference," and he did not feel it was "worthwhile" to talk with her about it, even though he used it as a factor to fire her. (R. Clark Dep. at 161-163.)  Similarly, he also failed to tell Plaintiff the concerns relayed about her by Paul Labuda because he did not "think it would make a difference." (R. Clark Dep. at 163.)

Rob Clark stated that he relied on the input of his management team when they expressed their concerns to him.  (R. Clark Dep. at 161:7-12, 198:3-21.)  But Paul Labuda indicated that he was surprised to learn of Plaintiff's termination because Rob Clark told him that he would "follow up and work with her on those issues" they discussed. (Labuda Dep. at 91-92.)  Tracie Clark was also surprised to learn of Plaintiff's termination, and she stated that others were surprised also.  (T. Clark Dep. at 13.)  Plaintiff also testified that Jim Rura told her he was not happy with the decision.  (Detwiler Dep. at 117-18.)

Furthermore, Rob Clark did not meet with Plaintiff after her return to complete her 2007 performance review, discuss her accomplishments, set goals, or discuss an action plan for the upcoming year.  Rob Clark testified that he did not meet with Plaintiff because he didn't see her performance improving so he didn't feel that they needed to sit down.  Moreover, he testified that it would be a tough conversation and although it was important, he did not discuss it with her. (R. Clark Dep. at 70-71.)

Plaintiff has pointed to such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons." Fuentes, 32 F.3d at 765. Therefore, with respect to Count II, the motion for summary judgment should be denied.

Counts III-IV: Disability Discrimination Claims

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  Discrimination on the basis of disability is also prohibited by the PHRA. 43 P.S. § 955.  Employment discrimination claims under the ADA and PHRA follow the McDonnell-Douglas format.  See Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 580 (3d Cir. 1998) (ADA); Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir. 2002) (PHRA disability claims).

Plaintiff does not have a disability.  Her claim must therefore be based on her husband's

disability and her parents' disabilities.  The associational provision of the ADA provides that the

term "discriminate" as used in the statute includes:

> excluding or otherwise denying equal jobs or benefits to a qualified individual
> because of the known disability of an individual with whom the qualified
> individual is known to have a relationship or association....

42 U.S.C. § 12112(b)(4).[20]  "A family relationship is the paradigmatic example of a 'relationship'

under the association provision of the ADA."  Den Hartog v. Wasatch Academy, 129 F.3d 1076,

1082 (10th Cir. 1997) (citing 29 C.F.R. § 1630.8).  However, the EEOC Interpretive Guidance

for this section states that:

> an employer need not provide the applicant or employee without a disability
> with a reasonable accommodation because that duty only applies to qualified
> applicants or employees with disabilities. Thus, for example, an employee
> would not be entitled to a modified work schedule as an accommodation to
> enable the employee to care for a spouse with a disability.

29 C.F.R. Pt. 1630 App. § 1630.8.[21]

In Den Hartog, a teacher at a private boarding school brought suit when the school

refused to renew his contract because his son, Nathaniel, who suffered from bipolar disorder, had

---

[20]     The PHRA also has a section stating that it is an unlawful discriminatory practice "to
exclude or otherwise deny equal jobs or benefits to a person because of the handicap or disability
of an individual with whom the person is known to have a relationship or association."  43 P.S.
§ 955(*l*).  There are no reported cases construing this section.  As noted above, courts routinely
apply the ADA's provisions to PHRA claims.

[21]     The EEOC has been given authority to issue regulations to implement Title I of the ADA.
42 U.S.C. § 12116; Sutton v. United Air Lines, Inc., 527 U.S. 471, 478 (1999).  Although the
agency's Interpretive Guidance may not be entitled to deference pursuant to Chevron U.S.A. Inc.
v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), it is still "entitled to respect" to
the extent that it has the "power to persuade."  Christensen v. Harris County, 529 U.S. 576, 587
(2000).  The Court of Appeals has referenced the Interpretive Guidance to resolve issues under
the ADA.  See Skerski v. Time Warner Cable Co., 257 F.3d 273, 280, 285 n.4 (3d Cir. 2001);
Marinelli v. City of Erie, Pa., 216 F.3d 354, 360 (3d Cir. 2000).

threatened the headmaster and other people on the campus.  The court reviewed the legislative history of the association provision and specifically noted that the plain language of section 12112(b)(5) led to the conclusion that "discriminate" meant "not making reasonable accommodations" only with respect to the disabilities of job applicants or employees, not their relatives or associates.  129 F.3d at 1084.  The court cited the Interpretive Guidance and concluded that "Wasatch was not required under the ADA to provide Den Hartog with any 'reasonable accommodation' of *Nathaniel's* disability."  129 F.3d. at 1084-85.  In Erdman, the Court of Appeals cited both § 1630.8 and Den Hartog approvingly.  582 F.3d at 510 ("the association provision does not obligate employers to accommodate the schedule of an employee with a disabled relative.")

Thus, Plaintiff could not request an accommodation in the form of time off on the grounds that she needed to take care of her ill husband or her parents.  Plaintiff states that she is not contending that Clark Metal failed to accommodate her husband's disability, but that Clark Metal fired her because of his disability, or because of its concern with increased health care costs that his disability would incur, and/or that she was inappropriately fired because she was "distracted," meaning that she was having difficulties concentrating because of her husband's illness but could still satisfactorily perform the functions of her position.

In Erdman, the Court of Appeals held that a plaintiff who attempts to invoke the association provision must demonstrate that she was fired "because of" her relative's disability, that is, that she would not have been fired if she had requested time off for a different reason.  582 F.3d at 510.  The court also indicated that a plaintiff could maintain a claim if she were fired because the employer feared that she might miss work to care for a disabled relative even though

44

she had not taken or requested time off, because a decision motivated by such unfounded

stereotypes may be fairly construed as "because of" the disability itself.  Id. at 510-11.  However,

the court held that Erdman, whose claim was based on her desire to take time off to care for her

daughter, Amber, who was born with Down Syndrome, could not meet either standard:

> the record is devoid of evidence indicating that Nationwide's decision to fire
> Erdman was motivated by Amber's disability. Indeed, Nationwide was aware of
> Amber's disability for many years before Erdman was fired. The most Erdman
> can hope to show is that she was fired for requesting time off to care for Amber
> (the basis for her FMLA claim), not because of unfounded stereotypes or
> assumptions on Nationwide's part about care required by disabled persons.

Id. at 511.

In this case, the same situation exists: Clark Metal was well aware of Plaintiff's

husband's illness before she was fired.  Thus, although she can state an FMLA claim that she was

fired for having requested time off to care for him, she cannot state an ADA associational

discrimination claim that she was fired because of unfounded stereotypes or assumptions on

Clark Metal's part about care required by disabled persons.

In Erdman, the Court of Appeals also cited Larimer v. IBM, 370 F.3d 698 (7th Cir. 2004),

and made the following observations:

> a plaintiff may prevail under the association provision in other circumstances not
> at issue in this case. For example, the Seventh Circuit requires an association
> provision plaintiff to show "that his case falls in one of the three categories in
> which an employer has a motive to discriminate against a nondisabled employee
> who is merely associated with a disabled person." Larimer, 370 F.3d at 702.
> Larimer described these categories as: (1) termination based on a disabled
> relative's perceived health care costs to the company; (2) termination based on
> fear of an employee contracting or spreading a relative's disease; and (3)
> termination because an employee is somewhat distracted by a relative's disability,
> yet not so distracted that he requires accommodations to satisfactorily perform the
> functions of his job. Id. at 700. See also 29 C.F.R. § 1630.8, Appendix (noting
> that the association provision prohibits an employer from firing an employee
> because of a fear that his volunteer work with AIDS sufferers may cause the

employee to contract the disease himself, or from reducing an employee's health benefits because of a disabled relative).

Id. at 511 n.7.  However, the court did not discuss these possibilities further, because the plaintiff did not assert them.

In this case, Plaintiff asserts two of the three circumstances identified in Larimer: fear of higher health care costs and "distraction."  Defendant responds that the record contains no evidence to support either theory.

In Larimer, the plaintiff was fired by IBM shortly after his twin daughters, who were born prematurely with multiple serious medical conditions, came home from the hospital.  The court articulated the three categories noted above and concluded as follows: 1) Larimer could not rely on disability by association because his daughters' conditions were not communicable to him; 2) he could not rely on the distraction theory because there was no evidence that he was distracted at work; and 3) he could not rely on the expense theory because there was no evidence that health benefits were in the budget of the unit of IBM that employed him.  370 F.3d 701.  The court went on to discuss the McDonnell-Douglas test, but it concluded that it was not really possible to articulate a claim under this situation because if the fourth element requires the employee to prove that he was discriminated against because of the disability of a person with whom he has a relationship or other association, that makes out a prima facie case but is not a true variation of McDonnell-Douglas, and if the fourth element consists of merely showing that the employer knew the employee had a relationship or association with a disabled individual, this would sweep too broadly.  Id. at 701-02.  The court concluded that it would be better "to require, as Den Hartog does though not in precisely these words, that the plaintiff present evidence that his case falls in one of the three categories in which an employer has a motive to discriminate against a

nondisabled employee who is merely associated with a disabled person." Id. at 702.

Following Larimer, the Court of Appeals for the Tenth Circuit discussed the association discrimination provision in Trujillo v. PacifiCorp, 524 F.3d 1149 (10th Cir. 2008).  The court noted the three categories outlined in Larimer and further observed that the district court had designated the case as presenting an expense situation: the Trujillos contended that they were both terminated by PacifiCorp after the company found out about the relapse of their son Charlie, who required expensive medical treatment.  The district court concluded that the Trujillos had not established a prima facie case of association discrimination, but the court of appeals disagreed:

> In Larimer, the court noted that the plaintiff "made no effort to pitch his case" on the ground that the company had a stake, however attenuated, in firing an expensive employee. 370 F.3d at 701. A thorough review of the record reveals the Trujillos not only made the effort but also established the necessary connection. As enumerated in the background facts, the Trujillos offered everything from evidence of general concerns about the rising cost of healthcare to the specific facts that Charlie's claims were considered high dollar, that there was only one other terminal illness during the relevant time period, and that PacifiCorp was keeping tabs on those claims. While PacifiCorp seems to suggest the Trujillos needed direct evidence that the company was "monitoring the individual costs being incurred by the Trujillos' son for medical treatment," they only needed to present enough evidence for a reasonable inference of that premise to arise. The facts in the record raise such an inference.
>
> Highlighting that evidence, we note that, contrary to the district court's assertion otherwise, the Trujillos presented evidence that insurance costs factored into the budget line item for labor costs of each employee. Larimer indicates this evidence weighs heavily in favor of demonstrating motive to discriminate against an expensive employee, and we agree. A "manager would care about the actual expense for health services to the relatives of an employee in his unit because that expense would be in his budget." Larimer, 370 F.3d at 701. Evidencing that management knew about the cost of Charlie's healthcare, the Trujillos offer an email regarding Mrs. Trujillo's personal leave related to Charlie's illness in which the company stated it monitored both health and welfare benefits in conjunction with an employee's personal leave. From the evidence the Trujillos presented–concerns about rising healthcare costs, numerous efforts to cut those costs,

corporate monitoring of general healthcare costs and of Charlie's claims specifically–a jury could reasonably infer that PacifiCorp terminated the Trujillos because they were expensive employees.

Id. at 1156-57 (footnote and some citations omitted).  The court further observed that the

temporal proximity between the time of Charlie's relapse and the investigation into the Trujillos'

alleged time theft was unduly suggestive (three to six weeks).  Finally, the court held that the

Trujillos submitted sufficient evidence from which the trier of fact could conclude that

PacifiCorp's proffered explanation was a pretext for unlawful association discrimination:

> The Trujillos offered evidence regarding the differential treatment of similarly situated employees. For example, approximately four weeks prior to Mr. Trujillo's termination, another long term employee, Linda Todd, was under investigation by the same management employees for two separate incidents in which she made threats of violence against other employees. During the course of the investigation, Ms. Todd maintained that stress caused her behavior. She was initially put on short term disability leave until her situation improved, although she was ultimately terminated for working while on that leave, drug and alcohol abuse and workplace violence. The treatment of Ms. Todd differs drastically from the treatment of both Trujillos. Rather than progressively discipline the Trujillos, taking into consideration their past performance and their current situation, PacifiCorp immediately terminated them. The Trujillos also presented evidence of a situation in which an employee was not terminated after committing serious misconduct by viewing pornography twice on company computers. Finally, severely undermining the company's claim that time theft resulted in immediate termination, the Trujillos offered evidence that many other employees were punished with days without pay, rather than termination, for time sheet violations. This disparate treatment of similarly situated employees contributes to a reasonable inference of pretext, defeating PacifiCorp's claimed legitimate business reason for terminating the Trujillos.
>
> We also note the inferences that can be drawn from the irregularity of PacifiCorp's actions in the course of the time theft investigation. Evidence presented to the district court indicates that comparing an employee's time sheets to his gate log records was an unreliable method of determining whether an employee purposefully attempted to be paid for hours not worked. The same is true when comparing records of employees who were assumed to come in and out of work together. Although PacifiCorp appears to have a policy in place for both recording time worked and entry and exit of the plant, there was evidence that the policy did not reflect what actually occurred in practice. PacifiCorp's sudden

claim that a comparison of the Trujillos' time and gate records should exactly reflect the hours they self-recorded is suspicious given that managers, supervisors, and employees testified that neither time sheet nor gate access procedures were followed.

We also consider the failure to interview Dan Michaelis in the course of the investigation a significant circumstance contributing to the inference of discrimination. Mr. Michaelis, one of the Trujillos' supervisors during the outage, was never asked about the alleged overage on their time cards although he had signed some of their time sheets during the relevant time period. In an affidavit, Mr. Michaelis averred that due to Charlie's illness, he had allowed both Trujillos to leave early without any adjustment to their time in order to attend to their son.

Additionally, we note PacifiCorp's failure to apply its assumptions that the Trujillos came to work together to the benefit of the Trujillos. PacifiCorp only construed the evidence resulting from the comparison of their gate logs and time to sheets to the detriment of the Trujillos. For example, Mr. Trujillo's termination letter listed the fact that gate logs did not substantiate the hours he had listed on his May 18 and May 27 time sheets. While Mrs. Trujillo's gate logs showed attendance for the proper number of hours on those days, the company nevertheless ignored an assumption that Mr. Trujillo was there when his wife was, and used those dates as a basis for termination. Likewise, while records show that on May 10, 2003, Mr. Trujillo entered the plant earlier than the scheduled shift, Mrs. Trujillo was terminated, in part, for not having a gate entry prior to the entry of the start of the same shift.

Id. at 1158-59 (footnote omitted).

Increased Health Care Costs

Plaintiff participated in the insurance plan Clark Metal provided for its employees. Clark Metal was not self-insured.  (R. Clark Dep. at 92.)  Every year, the healthcare plan representatives told Rob Clark that the company's premiums increased due to "major health claims." (R. Clark Dep. at 92-93.)  During his discussions with the healthcare representatives, Rob Clark talked about the fact there would be an increase in the company's premiums if any plan participants had certain conditions requiring them to make "major health claims." (R. Clark Dep. at 92-93.)

As discussed above, Plaintiff notified Clark Metal on July 7, 2007 that she was encouraging her husband to quit his job.  Thus, Clark Metal was aware of the possibility that she would shortly be asking it to cover her husband's treatment for his serious illness under its health care plan.  (Detwiler Aff. ¶ 17.)  She was then fired on July 12, 2007.  Under these circumstances, Plaintiff has stated a claim for ADA associational discrimination based on Clark Metal's concerns over increased health care costs from a major health claim.

Defendant argues that the decision to terminate Plaintiff's employment had already been made before she notified the company that she was encouraging her husband to quit his job and that her email was relevant only with respect to the timing of her termination.  Thus, it contends that she cannot relate her termination to concerns over higher health care costs.

However, as summarized above, the record contains genuine issues of disputed fact as to the circumstances surrounding her termination.  Rob Clark testified that he essentially made the decision to terminate her employment following the May 30 meeting, but he took no action upon her return from her week off and appeared to be "lying in wait" for the minor (and vigorously disputed) infractions of company policy that she may have committed in June.  In addition, although some of the issues raised at the meeting were legitimate, others appear to be inappropriate criticisms of Plaintiff for having taken a week of vacation and for taking it with her girlfriends rather than spending the time with her ill husband and Rob Clark's notes after her return focus on her decision to tell him (jokingly) that younger men were hitting on her at the beach before relating that her husband had collapsed while she was away.  Drawing all inferences in Plaintiff's favor as the non-moving party, she has stated a case for associational discrimination under the health care cost scenario.

<u>Distraction</u>

Defendant argues that one of its legitimate, non-discriminatory reasons for terminating Plaintiff's employment was that she had become "an island" and was withdrawn from other employees.  However, this statement also allows for the inference that she terminated because she was "distracted" although she could still perform her job.  Rob Clark even admitted that he could understand why she might have been distracted given her husband's condition.  (R. Clark Dep. at 160.)   Under these circumstances, Plaintiff has stated a claim for ADA associational discrimination under the distraction theory.

Thus, with respect to the claims of disability discrimination under the ADA and PHRA in Counts III and IV, Defendant's motion for summary judgment should be denied.

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of the defendant (Docket No. 19) be denied.

Within the time specified in the Notice of Electronic Filing, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.


Respectfully submitted,


s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

Dated: March 19, 2010